### Petition of POPPER.
### A2100647

District Court, S. D. New York.
July 1, 1948.

Petitioner, per se.

Oswald I. Kramer, of New York City, Naturalization Examiner.

RIFKIND, District Judge.

The petitioner is a 53 year old, divorced female, native and national of Czechoslovakia, who was lawfully admitted to the United States for permanent residence on May 9, 1914. Her petition for naturalization was filed on May 31, 1946, under the general provisions of the Nationality Act of 1940, 8 U.S.C.A. § 501 et seq. The Naturalization Service has recommended that her petition be denied on the ground that the petitioner has failed to establish continuous legal residence in the United States and State of New York for the periods required by law, that is, since May 31, 1941, and November 31, 1945, respectively, as provided by Section 307(a) of that Act, 8 U.S.C.A. § 707(a), and that the petitioner has failed to establish that she was resident within the jurisdiction of the court in which the petition is filed, as required by Section 301(a) of the Act, 8 U.S.C.A. § 701(a).

The Immigration and Naturalization Service does not assert that the petitioner has been absent from the United States or from the State of New York at any time since 1914. The challenge to her residence arises out of the following circumstance: On October 23, 1917, deportation proceedings were instituted against the petitioner under a warrant of arrest charging that she was found in the United States in violation of the Immigration Act of February 5, 1917, 8 U.S.C.A. § 155(a), in that she had misbehaved subsequent to her entry, and that she was a person likely to become a public charge at the time of her entry. Thereafter, hearings were held and on De-cember 15, 1917, an order was entered by the United States Department of Labor directing the petitioner's deportation on the grounds recited. On January 26, 1918, a warrant for her deportation on said grounds was issued directing her return to the country whence she came.

On September 30, 1918, her case was reconsidered by the Department of Labor and she was paroled to certain authorities. On November 8, 1934, the case was again reconsidered and an order was made directing that the warrant of deportation be amended to direct deportation to Czechoslovakia. On November 26, 1934, such a warrant for her deportation was issued. On January 5, 1935, an order was made by the Immigration and Naturalization Service stating that a passport had been refused for the petitioner by the Czechoslovakian authorities on the ground that the petitioner had lost her Czechoslovakian citizenship and accordingly her release was authorized for lack of passport facilities. Since that time no action of any kind or character has been taken by the Service.

The Service contends that, upon the issuance of the warrant of deportation, the petitioner's residence in the United States became unlawful and, in support of that proposition, it cites three cases: Ng Fung Ho v. White, 1922, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 1938; Kumaki Koga v. Berkshire, 9 Cir., 1935, 75 F.2d 820; and Nakazo Matsuda v. Burnett, 9 Cir., 1933, 68 F.2d 272.

These cases do not support the proposition advanced by the Government. In the first of these cases the Court said that an alien may enter lawfully and remain unlawfully. In that case, the alien remained unlawfully in the United States in that he had violated the Chinese Exclusion Act, Act of May 5, 1892, Section 6, 8 U.S.C.A. § 287. That statute expressly rendered it unlawful for a Chinese laborer to remain in the United States when not in possession of a certificate of residence. The statute under which the warrant of deportation was issued in the instant case contains no such declaration of unlawfulness. The two other cases cite and quote the White case and, likewise, do not support the proposition advanced by the Government, in so far as

they are at all relevant. The Koga case held merely that an alien who entered as a treaty trader was deportable when he lost that status, and the Matsuda case, similarly, held that an alien may be deported although he entered lawfully, if he overstays the period for which he is admitted. These propositions are not challenged. The section under which the order of deportation was made against the petitioner in the instant case, 8 U.S.C.A. § 155(a), does not denounce as unlawful the continued residence of a person against whom such an order is made. It prescribes that a person of the categories mentioned be deported.

█ In re Scriver, D.C.1935, 9 F.Supp. 478, held that the residence contemplated by the naturalization statute must be a legal residence. In that case the applicant had entered the United States illegally. In the instant case the petitioner entered the United States legally, and unquestionably, at one time, at least, had legal residence in the United States.

The sharp distinction between the instant case and the White case, supra, is so clear that the Government has advanced a secondary argument that, because the petitioner had behaved in a manner to render her deportable, her continued presence in the United States became unlawful. When Congress desired to make remaining in the United States unlawful it so provided, as it did in the Chinese Exclusion Act. Nowhere has it made continued residence in the United States by a person within the category of 155(a), to which petitioner belonged, unlawful. Moreover, the argument proves too much. If the Government's proposition were sound, it would follow that anyone who committed an act which rendered him subject to deportation, although no warrant issued, would nevertheless thereby convert his residence in the United States into an unlawful presence and he could, thereafter, never acquire status for naturalization regardless of his good behavior during the statutory period. That is not how the law has been administered by the Naturalization Service.

█ The Government also asserts that it is illogical that one subject to an order of deportation should at the same time be eligible for citizenship. A certain inconsistency is undoubtedly revealed thereby. Of course, Congress, had it so desired, could have specifically provided that one subject to an order of deportation shall not be eligible for naturalization. Congress has not enacted such a provision despite the fact that on occasions courts had admitted to citizenship persons subject to deportation orders. So the Naturalization Examiner has informed me. A case in the books to the same effect is United States v. Waskowski, 7 Cir., 1947, 158 F.2d 962. There is more substance in the contention that if the court admits the petitioner to citizenship it is indirectly quashing the order of deportation; except in rare cases a court could not do so directly; 8 U.S.C.A. § 155. This means that the more orderly procedure dictates the wisdom of first having the order of deportation vacated by the Immigration Service before the application for naturalization is considered. As a general rule that seems preferable.

█ But what are the facts in the instant case? On January 5, 1935, an order was made by the Immigration Service by which the petitioner's release was authorized. Since then, 13 years have elapsed without the exhibition of any interest in the petitioner on the part of the Government. She has thus lived in the United States from 1914 to 1948, certainly the major portion of the petitioner's life and all of her mature years. The Government does not even now suggest that it still contemplates the deportation of this elderly woman; nor does it contend that petitioner is now an immoral person. (It was this change in the facts supporting the deportation order that prompted the decision in United States v. Waskowski, supra.) The only plausible inference that can be drawn is that, to all intents and purposes, the order of deportation is, in the judgment of the Service, a dead letter. I do not mean to suggest that it is the mere passage of time which brings about the demise of the order of deportation. Perhaps such an inference could not be drawn had the applicant been a fugitive from the warrant of deportation. Perhaps such an inference could not be drawn where the Government continued to assert an interest in the depor-

tation. Perhaps it could not be drawn in a case where, by legal maneuvers, such as applications for writs of habeas corpus, the applicant had delayed deportation. It is a question of the real status of the order, and I suggest that we ought not to submit to the magic of mere paper and words. It is not laches which saps the warrant of its life. The contrary has been held, Restivo v. Clark, 1 Cir., 1937, 90 F.2d 847; Seif v. Nagle, 9 Cir., 1926, 14 F.2d 416, certiorari denied 273 U.S. 737, 47 S.Ct. 244, 71 L.Ed. 866; United States v. Smith, D.C.W.D. N.Y.1924, 2 F.2d 90; Ponzi v. Ward, D.C. D.Mass.1934, 7 F.Supp. 736; In re Hanoff, D.C.N.D.Cal.1941, 39 F.Supp. 169; Cf. United States v. Parson, D.C.S.D.Cal.1938, 22 F.Supp. 149. But the facts indicate that the Government has no real interest in the preservation or in the existence of the order of deportation. To all intents and purposes it is a dead file serving no public purpose other than to constitute a cloud upon the petitioner's existence.

The only reported case directly in point is United States v. Waskowski, 7 Cir., 1947, 158 F.2d 962, where the Circuit Court of Appeals reached the result that an order of deportation was not an insuperable obstacle to naturalization. Though it arrived at its decision by a different route, its conclusion is the one that I follow.

Petition is granted